HON. ZENON LABAUVE,
HON. JOHN H. ILSLEY,
HON. R. K. HOWELL,
HON. R. B. JONES,
} *Associate Justices.*

WM. D. LEWIS & O'NEIL—SKIPWITH & OSBORN, Subrogated, *v.* THE SHIP "SUCCESS" AND OWNERS.

Customs result from a long series of actions constantly repeated, which have by such repetition, and by uninterrupted acquiescence, acquired the force of a tacit and common consent.

When the question is of a custom or usage, and it is not known to those who, from business and connections, have the best means of knowing it, the ignorance of it is, in some sense, positive testimony of its non-existence.

The Carrier is not responsible for delay in the voyage on account of boisterous weather, or adverse winds, low tides, or the like. These are dangers and accidents of the navigation over which he has no control, and against which his contract contains no warranty

The law applicable to Common Carriers is one of great rigor, and discountenances negligence and want of care in Common Carriers, who are required to transport goods and merchandize for the public, carefully, safely and expeditiously.

If the damage has proceeded from an intrinsic principle of decay, naturally inherent in the commodity itself, whether active in every situation, or only in the confinement or closeness of the ship, the merchant must as well as pay the freight, as the master and owners are in no fault; nor does their contract contain any insurance or warranty against such an event.

The value of merchandize at the port of destination is the basis of valuation in contracts of affreightment; and, when goods are damaged in transitu, the market value of the goods, at the port of delivery, is the standard of damages.

A receipt for goods, in a damaged condition, by the consignee, does not affect his legal rights.

APPEAL from the Second District Court of New Orleans, *Morgan*, J.

*C. B. Singleton, for plaintiffs and appellants.*—If a vessel, by any act or neglect whatever of man, shall be rendered unfit to perform the intended voyage, she thereby becomes unseaworthy. The defendants were bound to take such steps as would enable them to perform the voyage

with reasonable despatch. No mistake or oversight can protect them from damages in such case, even where the greatest care has been exercised. 2 Parson's Mar. Law, 137. 1 Arnould on Ins. 675, 681. Angell Com. Car. sec. 172, 173. 4 An. R. 567. 5 An. 264. 6 N. S. 645.

The learned counsel for defendants contend that the damage was produced by natural causes, for which they are not liable. Natural causes do not always exempt from liability for damage. If the act of man, by carelessness, or otherwise, contributes in any manner in producing the damage, then the common carrier is liable. Angell on Carriers, § 67, 174. By natural causes is meant the act of God, such as lightning, storms, floods, &c., &c. The Superior Court of Errors and Appeals of Delaware, say : "By the act of God," is meant such inevitable accident as cannot be prevented by human care, skill or forethought, but results from natural causes, such as lightning and tempests, floods and inundation. *McHenry* v. *Railroad Co.* 4 Harring, (Del.) R. 448. Angell on Common Carriers, § 154. How hopeless is the case of defendants, when these principles of law are applied to it. Was the condition of the bar always looked into by prudent persons, loading vessels in New York for New Orleans ? Yes. Could the condition be easily ascertained ? Yes, from one to five days. The bars become notoriously bad about the 1st of January, about which time the ship Mary G. Campbell grounded on the bar, and remained about ninety days. She drew nineteen feet.

*Durant & Hornor, for defendants.*—If the detention of the ship was the cause of damage to the cargo, it was a cas fortuit specially excepted in the bill of lading.

Corn and oats are, in the language of Insurers, "articles perishable in their own nature." 1 Philips on Insurance, § 54.

The expressions of our Code (Louisiana Code, 2725) are "accidental and uncontrollable events."

What produced the detention of the ship at the bar ? Was it because she drew too much water to permit her crossing it ? All the evidence shows that she was loaded to a very usual draft; and even if she had drawn but sixteen feet, still she would have been detained. It was the unusual, accidental, unavoidable, and uncontrollable condition of the bar that created the detention. It is impossible to tell what part of this condition is attributable to the act of man, and what part to natural causes ; but the whole condition of the bar, so far as it prevented the Success from crossing, can in no manner be attributed to the defendants or to their agents ; and hence cannot be the basis of any responsibility for damages.

Where the law creates a duty or charge, and the party is disabled to perform it, without any default in him, and hath no remedy over, there the law will excuse him. *Hadley* v. *Clarke*, 8 Durnford & East. 259.

If, by any act of misfortune, not amounting to the act of God or of the public enemy, the transportation of the goods is obstructed or delayed,

the carrier will not be answerable for the delay so occasioned, if he has used a reasonable degree of exertion and diligence in the transportation. Angell on Carriers, § 289.:

In respect to the time of delivery, the carrier is responsible only for the exertion of due diligence. In this respect, Common carriers stand upon the same ground with other bailees. *Parsons* v. *Hardy*, 14 Wendell, 217.

This doctrine was reaffirmed in *Bowman* v. *Teal*, 23 Wend. 306; and is enunciated likewise in 4 Annual, 563, *Rathbone* v. *Neal*, though in the reasoning the carrier's responsibility for his delay in delivering the cargo is made, very correctly, to depend upon the unseaworthiness of the ship, before and at the time of leaving port. See also *Murrell* v. *Dixeys*, 14 An. 298.

This case, from 23 Wendell, arose from the delay caused by the freezing of the canal in New York; and this freezing of our canals and rivers is, in most respects, an event causing delay to the Carrier, very similar to the shoaling of the bars at our passes. If an extraordinary winter at the North should block up their canals and rivers a month earlier, and continue a month later, than usual, the case would be identical in principle with the one now before the Court. But what " ordinary forecast" would anticipate such a winter ?

ILSLEY, J. This is an action upon a contract of affreightment. On the 17th, 18th and 19th of January, 1859, the plaintiffs shipped, in good order and condition, on board the ship Success, then lying in the Port of New York, and bound for New Orleans, some corn and oats (the quantity, quality and condition of which, at the time of shipment, being abundantly proved), to be delivered in the like good order and condition at the port of destination (the dangers of the seas and fire only excepted). The only qualification in the bill of lading, for either the corn or oats, was that of " *quantity unknown*," in the latter.

The Success sailed from New York on the 23d January, 1859, and in ten days thereafter reached, without accident, Pass à L'Outre, one of the entrances into the river Mississippi ; but owing to the shoaliness of the water in the Passes she was unable to cross the bar, and was detained thereat some sixty-seven days (a detention unprecedented), and only reached New Orleans on the 13th April, 1859. When the ship at length reached the city, the plaintiffs' corn and oats were so much damaged that they were rendered unmerchantable, and the present action was instituted to recover from the defendants the sum of six thousand one hundred and forty-eight dollars and forty-six cents, for the loss and damage sustained by them, by the failure and neglect of the defendants to deliver the corn and oats within a reasonable time, "in good order and condition."

The ship was attached and regularly bonded ; and the defendants, alleging want of authority in the plaintiffs' agent to sue it out, took a rule on them to dissolve it, which was properly dismissed, as we find in the record;

besides the telegraphic dispatch, a letter to the agents from the plaintiffs, instructing them to institute legal proceedings; and, as auxiliary thereto, to use every conservatory means; and this letter was received by the agents three days before proceedings were commenced.

The defendants plead the general issue, followed by a special denial of the neglect, carelessness and want of skill on the part of the persons in the charge of the Success. They aver that they were ignorant of the interior condition of the bags and sacks at the time of shipment, and that they delivered them in the same good order, outwardly, as that in which they had been received, except a quantity (less than twenty bags) of oats which were stained with saltpetre. They then refer to the departure of the Success from New York and her arrival at Pass à L'Outre, where they attribute her detention to a succession of fortuitous circumstances, over which they could exercise no control; to the shoaliness of the water from natural causes, increased by incoming and outgoing ships lying for some time at and on the bar, thus preventing the egress and ingress of other ships, and obstructing the progress and effect of the water of the river in its way to the sea; and they aver that, during the delay, all efforts were made by the captain of the Success to obtain a conveyance across the bars, but in vain; and, finally, that when the water deepened sufficiently, the Success made her way with all proper expedition to this city.

The defendants then reconvene for the amount of their freight and primage, seven hundred and eighty-four dollars and nineteen cents, with interest and costs, subject to a reasonable deduction for the oats damaged by saltpetre.

The lower Court rendered judgment on the original demand in favor of the defendants, and also in their favor on their reconventional demand, deducting thirty dollars for the twenty sacks of oats damaged, but without interest. The plaintiffs have appealed.

That the progress of the Success was arrested by a natural obstruction (the bars at the entrance of the river) is not to be doubted; nor is it less questionable that, without the protracted delay thereat, the grain would not have been delivered in a damaged condition; and hereupon we must determine what, in the eye of the law, caused the detention of the Success and the injurious consequences thereof to the plaintiffs. Was it the unusual and unprecedented shoaliness of the water; or was it the want of care and diligence in the persons in charge of the vessel in loading her too deeply? On this question a vast deal of testimony has been adduced by both parties to the suit; and, keeping that testimony in view, we will proceed to the examination of the points made by the plaintiffs' counsel, which involve the whole merits of the case.

He contends, 1. That the ship Success was unseaworthy for her intended voyage when she left the port of New York, in consequence of being loaded too deeply to cross the bar, and in violation of the custom and usage of the port of New York on that point.

2. That she became unseaworthy by the gross carelessness, negligence

or incompetence of those in charge of her, whose duty it was to see that she was in proper condition to perform with reasonable despatch her in-tended voyage. They could easily have obtained the information neces-sary to enable them to load her properly, so she would not be detained on the bar.

3. That her unusual detention of nearly two months and a half was the result of incompetency or wilful negligence on the part of her master, in not availing himself of the necessary means at his command to cross the bar, and perform the voyage in time to save the corn and oats from destruction.

4. Admitting, for the sake of argument, that the unusual dentention was unavoidably caused by the dangers of the seas, excepted in the bills of lading, still the master and owners are liable for the damage to the corn and oats, in not taking proper care of the cargo during the said detention.

I and II. The position assumed by the plaintiffs, in their first two points, is this : that it is the duty of the master and owners of ships loading at the port of New York for New Orleans (a duty which the usage and cus-tom of that port render obligatory upon them) to obtain the speediest and surest information as to the exact condition of the bars at the entrance of the Mississippi, so that by loading their ships with special reference to that condition, no unnecessary delay shall occur in making their voyage and delivering their freight.

This was not the opinion of the District Judge who tried the case in the Court below. He held that "it cannot be expected that ships trading be-tween two ports should load with reference to the possibility of a certain stage of water. The ordinary and usual stage should be their guide, and if they load with reference to the ordinary condition of the entrance of the port, this is all that can be demanded of them."

We learn from witnesses (pilots for the Passes of the Mississippi), whose peculiar avocations enable them to ascertain accurately the usual and or-dinary drafts for ships bound into the river ; these witnesses, and others, too, say that the draft of the Success at the time she reached the Pass would be deemed an ordinary and usual one. The year 1859, it is true, was an exceptional and unprecedented one in this respect; but it was not, nor could it have been, an ascertained fact, what detention a ship loaded as usual would undergo, if she even met any detention at all ; and this for the evident reason that the depth of water on the bars depended alto-gether on causes and circumstances upon which no correct and certain estimate could be formed.

A ship loaded with special reference to the condition of the bar, at the time of loading, would have been no more certain of entering with her load, than a ship loaded as customary, with hers ; and, if on her arrival, the vessel drawing the least water found, as she well might, enough of water to admit the vessel drawing the most, she would discover that she had refused taking more cargo, without any practical benefit resulting from it.

In a state of things naturally so uncertain, the view taken by the District Judge is a reasonable one; and rules founded in reason and common sense, and resting on sound, practical considerations, can be, at all times, safely adopted. The contract of affreightment did not, in the absence of any particular usage or custom, contemplate that the Success would draw no more water than happened to be on the bars, when she was receiving her cargo.

But the usage is relied on as having entered into the agreement, and it is urged that the non-observance of it justified the present action for damages. We are not satisfied that any such usage or custom did exist, notwithstanding the proof adduced to sustain it.

It had not the requirements of article 3, Louisiana Code, to constitute a custom; and the test laid down in *Pratt* v. *Thatcher*, 9 Peck, is lacking: "When," in that case, says Parker, C. J., "the question is of a custom or usage, and it is not known to those who, from business and connections, have the best means of knowing it, the ignorance of it is, in some sense, positive testimony of its non-existence."

It was certainly not known to any of the officers on the Success, nor does it appear to have been deemed obligatory, or even known to the agents of the line of ships in New York, plying between that city and New Orleans. On this point *H. M. Allen*, the master of the ship James R. Keeler (whose ship drew 17 feet 4 inches, and lay fifty-four days on the bar), will inform us. He observes: "I made very strict enquiries as to the condition of the bars, of the agents of the line trading here (New Orleans), they receiving constant advices from here, and being best informed. They told me there was not the slightest risk, and even advised me to load at eighteen feet; that they had been loading at seventeen and a half, and eighteen feet, and that I was very foolish not to take in any more cargo."

This was, indeed, singular advice, and still more singular conduct, given and observed by ship agents in the trade, had such a custom or usage in relation to loading been then (in January, 1859) existing at the port of New York.

We attribute the unusual detention of the Success, like that of the James R. Keeler, at the bars, to their accidental and uncontrollable condition, unusually protracted in 1859, as the pilots all testify, and also to the consequent accumulation thereat of ingoing and outgoing ships; and we think that, as the Success had an ordinary draft of water, and not exceeding the draft of ships loaded by the New York and New Orleans shipping agents, she cannot be deemed to have been unseaworthy in that particular, when she left the port of New York.

In the case of *Boyle* v. *McLaughlin*, the Court observes: "The carrier is not responsible for delay on the voyage on account of boisterous weather, or adverse winds, low tides, or the like." These, says the Supreme Court of the United States, in *Clark et al.* v. *Barnwell et al.* 12 How.

283, "are dangers and accidents of the navigation over which he has no control, and against which his contract contains no warranty."

As was well observed by Marshall, C. J., in *Boyce* v. *Anderson*, 2 Howard, 155, the law applicable to common carriers is one of great rigor, and though to the extent to which it has been carried, and in the cases in which it has been applied, like those referred to by the plaintiffs in this case, we admit its necessity and policy, we do not think it ought to be carried farther or applied to new cases.

We therefore deem the first and second points untenable.

III. It seems to be conceded that the only possible means (every other one attempted having failed) of getting the Success over the bars, was by lightering her; and why was not this mode resorted to ?

*S. Porter*, one of the witnesses (a coast pilot), says, in connection with this matter : "The months of February and March are the roughest months of the year at the Passes (and this is corroborated by other testimony), and there is danger attending the lightering of vessels during rough weather ; and when the sea is rough vessels cannot lie safely alongside of each other."

On the first arrival of the Success at Point à L'Outre, the master might, say the mates, perhaps, have procured a lighter for the Success, but the weather was then unsettled, and the detention may well have been supposed to be merely temporary. It was very unusual for vessels to lighter; and, as the cargo of the Success was a general one, and, in all probability, that part of the cargo uppermost was the most valuable (as the grain was in the lower hold), the most valuable part of the cargo would have been thus exposed by transhipment, in order to save the portion of it belonging to the plaintiffs. It is true that four of the ships lying at the Passes, simultaneously with the Success, were lightered over the bars; but this was only *fifty-four* days after their arrivals, respectively; and under what circumstances they were lightered, we are not informed.

The Success did, at the same time, make a similar attempt to lighter, but the only steamboat that could be procured for that purpose, had only room on her guards, and the captain of the Success very properly refused thus to risk his cargo.

We do not, therefore, in view of all the circumstances, consider the master of the Success blamable for not resorting to lightering to cross the bars.

IV. It must be here observed, that the commodity shipped by the plaintiffs on the defendants' ship was bona peritura. And it has been held "if the damage has proceeded from an intrinsic principle of decay, naturally inherent in the commodity itself, whether active in every situation, or only in the confinement or closeness of the ship, the merchant must as well as pay the freight, as the master and owners are in no fault; nor does their contract contain any insurance or warranty against such an event. 12 East. 318 ; 4 Camp. 119 ; 6 Taunt. 65 ; Abbott on Shipping, 428.

But, if it can be shown that it might have been avoided by the use of proper precautionary measures, and that the usual and customary methods for this purpose have been neglected, they may still be held liable.   And the same rule applies in the case of damage on account of the humidity and dampness of the ship; which is, more or less, incident to all vessels engaged in trade or navigation, especially those upon the high seas.   12 Howard's Rep. 283.

The matter to be now inquired into, therefore, is, did the persons in charge of the "*Success*" bestow on the cargo such care, and pay such attention to it, whilst she was detained at the bars, as they should have done ?

There is some discrepancy in the testimony on this point.   On the one hand, the pilot who had charge of the vessel, and who says he was in her two-thirds of the time she lay at the Pass, never saw the hatches open but once, and that was when he ordered them to be taken off to trim the cargo ; and that was on a bright, sunshiny day ; and the master of the Success himself, when late in March, or early in April, he was advised by one of the consignees to air the cargo, replied that he would attend to it when he returned.   On the other hand, the entries in the log-book of the ship, which the first mate makes part of his evidence, show that some steps were taken in that direction.   We will refer to this last statement.

The ship reached Pass-à-Loutre on the 4th February, 1859.   Between that day and the 13th of that month there had been some clear weather, and on the last day mentioned the hatches of the main deck were opened "to air the cargo."  Thence to the 22d March next following, the weather, generally, was foggy, cloudy and rainy.   There were however during that period some fine days, viz: on the 10th, 14th, 17th and 19th, and the hatches were only again opened on the 22d March.

On the 27th of March, there is an entry that the cargo was suffering from fog and heat.

The weather during the detention of the ship was generally foggy and damp; yet there were some intervals of clear, fine, sunny days; but the dampness and humidity of the atmosphere necessarily penetrated into the Ship, and it, therefore, was of the utmost importance, in order to counteract its injurious effects on the cargo, that the ship should be aired and ventilated upon every suitable occasion and by every practicable means.

The hatches of the main and lower decks, although the removal of the one on the lower deck occasioned some trouble in breaking cargo, should have been removed upon every possible occasion, and windsails introduced as often and effectually as possible; and neither of these things were done, as we conceive, as often and effectually as they should have been.   Up to the 22d March the hatches were only removed twice, and it was only on the 12th April that the hatches on the lower deck (the plaintiff's grain being in the lower hold of the ship) were taken off.   By diligent attention to this important and cautionary duty, no reason can be perceived why the plaintiffs' grain, like that on the ship James R.

Keeler, which was delivered in excellent condition, should not have been delivered to them in like good order.

The law discountenances negligence and want of care in common carriers, who are required to transport goods and merchandize for the public, carefully, safely and expeditiously. We do not hold the master and owners of the Success liable for damage to the plaintiffs' grain on account of her protracted detention, which was unavoidable, and within one of the exceptions of the bill of lading; but for lack of due and proper care of the property during the time she was so detained.

The difference in the weight of the grain as charged to the defendants on the one side, and credited to them on the other, is very satisfactorily accounted for. It underwent the heating process, which is the effect produced by the decomposition of vegetable matter. The heat subsides when the substance of the oats has utterly perished, the chaff or outer coating of the oats moulds and dries, and the grain becomes exceedingly light. It must necessarily be light, when there is no longer any substance in the grain.

It has been frequently held by this Court, that the value of merchandize at the port of destination is the basis of valuation in contracts of affreightment; and that when goods are damaged in transitu the market value of the goods, at the port of delivery, is the standard of damages. 6 N. S. 60, 7 L. 240, 4 A. 464, 10 A. 413, 11 A. 203, 11 A. 324. There is evidence in the record to show what was the market value of corn and oats in New Orleans when the Success should, without accident, have reached that port, say about the 8th February, 1859.

On that day the value of oats of the quality of the plaintiffs' was eighty cents per bushel, and of corn of the same quality ninety-five cents.

It is not shown what those commodities were worth when the Success did arrive; but it appears that long after the 8th February the tendency was upward, and we think the first estimate may be safely assumed as the correct one.

The demand of the plaintiff was for six thousand one hundred and forty-eight dollars and forty-six cents, which must be reduced to the sum of five thousand seven hundred and ninety dollars and twenty cents, to which last sum with legal interest we think he is entitled to judgment, notwithstanding the receipt by him of the grain in its damaged state, which did not affect his legal rights. See *Rathbone* v. *Neal*, 9 A. 567.

It is therefore ordered, adjudged and decreed, that the judgment of the Court below be annulled, avoided and reversed; and it is further ordered, adjudged and decreed, that judgment in solido be, and it is hereby rendered, in favor of Skipwith & Osborne (in liquidation), Samuel Smith & Co. and J. A. Lum & Co. subrogated to the rights of William D. Lewis & O'Neil, plaintiffs, and against Arthur Childs, master of the ship Success, and part owner thereof, and Joseph Day, Moses Chase, Joél Huston, D. E. Chase, Rebecca Sand, E. A. Child and J. O. Nathan, all part owners of the said ship Success, for the sum of five thousand

seven hundred and ninety and twenty-one hundredths ($5,790 21-100) dollars, less the freight on the grain, seven hundred and fifty-four ($754) dollars, with legal interest thereon, viz: five per cent. per annum from the seventh day of May, 1859, until final payment, with all the costs of this suit.

It is further ordered that the plaintiffs' lien and privilege, by virtue of the writ of attachment on the property seized, and also their lien and privilege on the ship Success created by law on vessels in favor of those whose goods and merchandize have been damaged while in possession of vessels under the contract of affreightment, be recognized and enforced.