SWIFT & CO v. TEXAS & PACIFIC R. R. CO. ET AL.

(May 24, 1926.   Opinion and Decree.)
(Feb. 14, 1927.   Rehearing Refused)
(March 28, 1927.  Writs of Certiorari and Review denied by Supreme Court.)

*(Syllabus by the Court)*

1. **Louisiana Digest—Carriers of Passengers and Goods—Par. 123, 125.**

It is not the duty of the New Orleans Public Belt Railroad to ice cars placed upon its tracks for switching.

2. **Louisiana Digest—Carriers of Passengers and Goods—Par. 108, 113, 114.**

The liability of a railroad as a carrier for goods in its custody for carriage continues until the consignee has been notified of their arrival at destination and until he has been given a reasonable time thereafter to remove the goods.

3. **Louisiana Digest—Carriers of Passengers and Goods—Par. 108, 113, 114, 118.**

The liability of a railroad as a carrier ceases after the consignee has had reasonable opportunity to remove them after notice given.

4. **Louisiana Digest—Carriers of Passengers and Goods—Par. 119.**

A railroad as a warehouseman is not responsible for goods damaged through the fault of the consignee.

5. **Louisiana Digest—Carriers of Passengers and Goods—Par. 124, 128, 130.**

A carrier is not liable if owing to heat perishable goods are damaged without his fault.

ON REHEARING

6. Louisiana Digest—Carriers of Passengers and Goods—Par. 96, 108, 147, 148.

Under Carmack Amendment, carrier voluntarily accepting goods for shipment to point on another line in another state is conclusively treated as having made a through contract and elected to treat connecting carriers as its agents for all purposes of transportation and delivery.

7. Louisiana Digest—Carriers of Passengers and Goods—Par. 114, 119.

Where the bill of lading, which is the contract between the parties, provides that the carrier is responsible to the shipper as a common carrier for a period of forty-eight hours, exclusive of holidays, after notice of arrival to consignee has been sent, the carrier is responsible for damage to shipment occurring during the free time allowed.

8. Louisiana Digest—Carriers of Passengers and Goods—Par. 137.

The contract measure of damage is the difference in market value of the goods on the day shipment should have been received and the market on the day of actual receipt.

9. Louisiana Digest—Carriers of Passengers and Goods—Par. 123, 125, 132.

When terminal carrier had not information of the perishable quality of the goods and the evidence shows that it was not negligent, suit against it will be dismissed.

Appeal from Civil District Court.   Hon. Porter Parker, Judge.

Action by Swift & Company, Ltd., against Texas & Pacific Railway Company et al.

There was judgment for defendant and plaintiff appealed.

Judgment affirmed.   On rehearing judgment amended.

Hall, Monroe & Lemann, M. W. Heard, of New Orleans, attorneys for plaintiff, appellant.

Spencer, Fenner, Gidiere & Phelps, A. A. Moreno, of New Orleans, attorneys for defendant, appellee.

Wm. L. Fayssoux, of New Orleans, special counsel.

CLAIBORNE, J.    This is a damage suit for the alleged negligent carriage of fresh meat.

The plaintiff averred that on September 21, 1920, they delivered a consignment of fresh meat, consisting of 186 calves, to the defendant, the Texas & Pacific Railway, at Fort Worth, Texas, for transportation to New Orleans via the Public Belt Railroad to the Julia street switch, for delivery to plaintiff's branch house and received a bill of lading therefor, annexed to the petition.

That the carload of fresh calves was highly perishable; that refrigeration was essential for its preservation, and that the ice bunkers of said car had to be kept well filled with ice at all times as the defendant knew; that by the terms of said bill of lading the ice bunkers in the cars were to be filled by the carrier at the following points: Longview, Texas, Boyce, La., and New Orleans; that the car arrived in New Orleans on September 24th at 11:20 a. m., and was delivered to the Public Belt Railroad at 3:40 p. m. of the same day.

That the City of New Orleans, through the Public Belt, failed to transfer said car to the Julia street switch, but carried the car to the Robin street yard where it was delivered to plaintiff on September 27th at 2 p. m.

That the defendant failed to notify plaintiff of the arrival of said car and was unable to inform plaintiff of the location of said car which was found by its efforts at the Robin street yard.

That the defendant neglected to put any ice in the car after its arrival in New

Orleans, in violation of their duty as carriers and of the bill of lading, with the result that when the car was delivered to plaintiff the ice bunkers were empty and the temperature in the car 52 degrees, and the meat was sticky, slimy and sour; it had to be sold at a loss of $411.23; that it filed its claim with the Texas & Pacific Railway on January 11, 1921.

The shipping order annexed to the petition calls for delivery at New Orleans Public Belt, Julia street switch. It carries upon its face, in blue ink, the words: Re-ice at Longview, Boyce, New Orleans; and in red ink: "Ice or re-ice to capacity with crushed ice and 12 per cent salt at stations specified and oftener if delayed".

The railroad admitted the consignment, admitted its perishable nature, and the necessity for refrigeration; it admitted its obligation to re-ice and that the meat arrived at 11:20 a. m. and was delivered at 3:40 p. m. of the same day to the Public Belt Railroad.

They further averred that their duty was performed when they delivered the car to the Public Belt, and that they were under no obligation to notify plaintiff thereof; that they were informed that on September 25, 1920, the Public Belt notified plaintiff; that owing to plaintiff's track being already loaded with cars to full capacity, the car could not be placed on its track and had been placed at the Robin street yard for their account.

That at the time of the arrival of the car, on September 24, 1920, the ice bunkers were three-fourths filled with ice, which was amply sufficient to protect the meat at the reasonable time required to transfer the car from the Public Belt to plaintiff's plant, which was the afternoon of the same day.

They denied all the other allegations of the petition.

Further answering, the defendant railroad denied that the Belt Road was their agent, or that it could be held liable for its acts or omissions; but that if they were held for the Belt Railroad, then they were entitled to a judgment over against the City of New Orleans.

The City of New Orleans answered that it was not engaged in the carriage of freight, but was simply switching cars and as such was under no obligations to ice cars.

It admitted that the car was delivered to the Public Belt Railroad at 3:40 p. m. of September 24, 1920; that immediately upon receipt of said car it gave notice to plaintiff of its arrival; that because of a congestion of cars on the tracks of plaintiff, the Public Belt Railroad was unable to place the car at plaintiff's plant at Julia street, but that it was ready to do so at any time that the plaintiff would have been able to receive it; that if the car was not delivered immediately it was due wholly to plaintiff's fault.

The Public Belt Railroad denied all the other allegations of the petition.

In a supplemental petition plaintiff claimed $996.19.

There was judgment in favor of defendant rejecting plaintiff's demand at its cost.

The plaintiff has appealed.

The question involved in this case is, whose fault was it that the meat when delivered was spoiled and incidentally:

1st. Was the car reasonably iced when delivered by the Texas & Pacific to the Public Belt Railroad?

2nd. Did the Public Belt Railroad notify the plaintiff of the arrival of the car?

3rd. Was it a part of the duty of the Public Belt Railroad to ice the car?

4th. Whose fault was it that the car was delivered to the plaintiff 48 hours after its arrival?

The obligation of the defendant, Texas & Pacific Railway, according to the shipping order, was to deliver the car to the "New Orleans Public Belt, Julia street switch". The car arrived at 11:20 a. m. on September 24, 1920, and was delivered by the Texas & Pacific Railway to the New Orleans Public Belt at 3:40 of the same day. At the time of the delivery of the car to the Public Belt, there was three-quarters ice in the car and that would last 24 to 36 hours.

It appears from this evidence that the railroad had performed its part of the contract. It could not be required to follow up the car after it had left its control and passed in the hands of the Public Belt Railroad.

The Public Belt Railroad did not deliver the car to plaintiff's Julia street switch, owing to the congested condition of the switch which did not admit of more cars. But it hauled the car to the Robin street yard and on the following date, Saturday, September 25th, notified the plaintiff of the arrival of the car and of its location. This is proven by a receipt of the notice signed by O. Harper, an employee of the plaintiff. The plaintiff strenuously objected to the reception of this receipt until Harper's signature was proven. But the defendants proved that Harper had previously signed similar receipts and that the last signature was the same.

As the fact of Harper's signature was peculiarly within the knowledge of the plaintiff, the burden was shifted upon the plaintiff to prove that Harper was not their employee or that he did not sign the receipt.

The plaintiff took delivery of the car only on Monday, September 27, 1920. At that time, the ice in the car had melted, the temperature had gone up to 52 and the meat was slimy and sour.

Whose fault was it that the car was not properly iced and was received only on the 27th?

The plaintiff says it was the duty of the Public Belt Railroad to have iced the car. We do not think so. It was not made its duty by contract, for it had no contract with the plaintiff as the Texas & Pacific had. Nor is it shown that it was customary for the Public Belt Railroad to ice cars, or that the plaintiff had any reason to believe or expect that the Public Belt Railroad would do so. On the contrary, the evidence is that on previous occasions, when cars were switched in the Robin street yard the plaintiff had iced them. If the plaintiff did not do it, the Public Belt Railroad had a right to believe that the Texas & Pacific had done it.

The Public Belt Railroad had no installation to do the icing and the plaintiff knew it.

Whether the Public Belt Railroad can be considered as a carrier or a warehouseman, there is a material difference between railroad carriers which carry goods for several days and are provided with depots and warehouses and facilities for holding goods and preserving them with ice and other carriers, such as belt roads, which do only a belting or switching business for a short time and possess none of the above facilities and do not extend them to the knowledge of their customers.

In 4 Elliott on Railroads, 3rd Ed., S. 2297, pp. 778-780, after stating the general rule that the liability of a railroad as a common carrier ceases, and that of a warehouseman begins only after the consignee has been notified and has had a reasonable time thereafter within which to accept delivery of the goods and remove them, says:

"There is, it is obvious, an essential difference between railroad carriers who are provided with depots or warehouses and carriers who are not so provided and do not assume to possess such facilities.

"In view of the considerations which we have outlined, it seems to us that a railroad company receiving goods for transportation, undertakes that it will retain the goods in its capacity of a common carrier for such a reasonable length of time as will enable the consignee to remove them, but that the consignee must exercise reasonable care and diligence in removing them; otherwise the company will be liable as a warehouseman and not as a common carrier, that is, that it ceases to be an insurer and is liable only in the event that the loss of the goods is caused by its negligence.

"The general rule, as we have said, must be subject to important exceptions. One of these exceptions, is that where the consignee is at the station when the goods arrive, knows of the arrival, has opportunity to remove them and declines to do so, he cannot insist that the company be held as a common carrier; he cannot indeed, insist that it be held if he is informed that the company cannot store the goods. So where the goods are shipped to a place where, as the shipper knows, there are no station buildings or warehouses, it has been held that the liability of the carrier terminates as soon as the goods are unloaded, or if left on the cars, are placed in a position ready for immediate delivery to the consignee. We do not believe that it can be justly said that a railroad company is under an absolute duty to provide buildings for storing goods at all places where its freight trains stop, etc."

In the case under consideration the plaintiff, consignee, was notified of the arrival of the meat on the 25th, he had every opportunity to remove it, but did not do so until the 27th. The evidence is that when on the 27th the plaintiff asked for the delivery of the car from the Public Belt yard to the Julia street switch, it was done within an hour after the request. The plaintiff knew that the contents of the car was meat, an inherently perishable article in the month of September, and that it required uninterrupted icing for its preservation. Yet they took no steps either to provide for the icing or for the removal of the meat until two days after they were notified of its arrival. It is true that the plaintiff, under ordinary conditions, had 48 hours within which to remove goods. But this rule left them the option of the delay. It did not cast upon the Public Belt Railroad the responsibility for damage for perishable goods. If the plaintiff chose to delay removing the meat up to the last hour and the meat was then spoiled, the plaintiff assumed the risks of the delay and it was owing to its negligence and not to any fault of the Public Belt Railroad that the meat was spoiled.

In the case of Wood vs. La. Ry. Co., 158 La. 504, 104 So. 306, the Supreme Court said:

"Liability of railroad as a carrier of goods had ceased when goods in its custody were destroyed by fire, where plaintiff had ample opportunity to remove the goods after notice."

"The liability of a railroad as a warehouseman depends on whether the goods in its possession were destroyed by reason of its fault." Also Gibbons vs. Yazoo & Miss. Valley R. Co., 130 La. 671, 58 So. 505.

We conclude, therefore, that it was not the duty of the Public Belt Railroad to ice the car; that the plaintiff had ample opportunity to remove the contents of the car after notice, and that the decay of

the meat was due to plaintiff's negligence and to the perishable nature of the meat for which the defendant was not liable. 2 Rob. 403; Wm. D. Lewis & O'Neil-Skipwith & Osborn vs. The Ship "Success" and Owners, 18 La. Ann. 1; Harter Act, 171 U. S. 190-191; 1 Michie, 764 S. 1003; 6 Cyc. 381; 7 L. R. A. 281; 1 Black 156; 36 Dalloz, p. 882, S. 31.

It is therefore ordered that the judgment appealed from be affirmed.

(Rehearing Granted June 21, 1926.)

---

OPINION ON REHEARING

JONES, J.    As the pleadings and the evidence are set forth in the original opinion, we will simply discuss the law.

In American Trading Company vs. New Orleans & Northeastern R. R. Co., 159 La. 9, the Supreme Court held as follows:

"Under Carmack Amendment, carrier voluntarily accepting goods for shipment to points on another line in another state is conclusively treated as having made a through contract and elected to treat connecting carriers as its agents for all purposes of transportation and delivery."

The New Orleans Public Belt R. R. Co. clearly comes within the terms of the Carmack Amendment, as section 1, subsection 3 of the Interstate Commerce Act clearly covers all switching and terminal carriers. That section reads as follows:

"The term 'railroad' as used in this Act shall include all bridges, car floats, lighters and ferries used by or operated in connection with any railroad, and also the road in use by any common carrier operating a railroad, whether owned or operated under a contract, agreement or lease, and also all switches, spurs, tracks, terminals and terminal facilities of every kind used or necessary in the transportation of the persons or property designated herein, including all freight depots, yards and grounds, used or necessary in the transportation or delivery of any such property."

Section 4 of the bill of lading, which forms the contract between the parties, contains the following stipulation:

"Property not removed by the party entitled to receive it within forty-eight hours (exclusive of legal holidays) after notice of its arrival has been duly sent or given may be kept in the car, depot, or place of delivery of the carrier or warehouse subject to a reasonable charge for storage and to carrier's responsibility as warehouse only, or may be, at the option of the carrier, removed to and stored in a public or licensed warehouse at the cost of the owner and there held at the owner's risk and without liability on the part of the carrier, and subject to a lien for all freight and other lawful charges, including a reasonable charge for storage."

This provision is binding on the parties.

(See Erie R. R. Co. vs. Shuert, et als., 250 U. S. 465, and Southern Railway Co. vs. Prescott, 240 U. S. 432.)

As the evidence shows that September 26th was a Sunday; that no notice of the arrival of car was given until September 25th, plaintiff clearly had under the free time until September 28th to accept delivery of the car, but the meat was badly damaged when unloaded by plaintiff on September 27th.

Furthermore, the bill of lading shows that the carrier was required to re-ice the shipment at Longview Junction, Texas, Boyce, La., and New Orleans.

The evidence shows that the bunkers were only three-fourths full when the car arrived on September 24th and that this amount of ice would suffice to preserve the meat only twenty-four hours under the weather conditions existing at the time.

As the carrier failed to carry out its contractual obligation and re-ice the shipment in New Orleans, it is liable for the damages caused thereby.

The evidence clearly shows that the Public Belt Railway Company was given neither the bill of lading nor information as to the perishable quality of the shipment nor of obligation to ice; that the switch of plaintiff was filled with cars on September 25th, and that cars were always delivered to plaintiff in the order of their arrival, except where special order was given the plaintiff for a prompt delivery, a precaution not taken herein.

As due care seems to have been shown by this defendant, we do not think it can be held liable.

Little Miami R. C. vs. Washburn, 22 Oh. St., 324; C. H. Bosworth, Receiver of Chicago, Peoria & St. Paul R. R. vs. Carr, Roider & Engler Company:

"Where cars in the yard of the terminal company were destroyed by fire, the Supreme Court of the United States said: 'Though in physical possession, under its agreement with the receivers of the car in which the goods were being transported, the terminal association had not become responsible as a carrier therefor, because it had not been put in possession of the way bill or other form of information on which it could proceed with the carriage.'"

See also General Equipment Company vs. John Barton Payne, Director General of Railroads and City of New Orleans, No. 8645, Court of Appeal, Parish of Orleans.

The evidence shows that the market price of meat in New Orleans on September 24th and 25th, the day on which shipment would have arrived, was nineteen cents a pound, and the total weight 21,665 pounds, making the total value $4,116.25, that owing to damage meat sold for $3,120.16, thus making a loss of $996.19 and we think plaintiff is entitled to recover the amount.

It is true that the bill of lading provides that the loss must be calculated on the value of the shipment at the point of origin, but in the case of Chicago M. & St. P. Railway Co. vs. McCall Dinsmore Company, 253 U. S. 97, the Supreme Court of the United States held that such a provision in a bill of lading was a limitation of liability and therefore, under the Cummings Amendment to the Interstate Commerce Act, null and void, when the loss at the point of destination was greater.

Defendant contends that plaintiff should recover in no event more than the amount it originally claimed, namely, $411.25, because the bill of lading requires that claim must be made in writing to the carrier. The clause of that document on this point reads substantially as follows:

"Except where the injury is due to delay or damage, while being loaded or unloaded, or damaged in transit by negligence, as condition precedent to recovery, claim must be made in writing to the carrier within six months after delivery."

As this damage was apparently caused while the car was still in transit by the negligence of the carrier, we do not think that the above provision applies, but even if it did, we do not think that it requires a claimant to state the exact amount of the damage, as it only says a claim must be filed. The obvious intent of the provision is to put the carrier on notice that damage has been suffered and then enable it to investigate with reasonable promptness. Defendant has cited no authorities sustaining his contention on this point, and we do not think it sound.

For the reasons above cited, our original decision is amended so as to read as follows:

It is ordered, adjudged and decreed that there be judgment in favor of plaintiff, Swift & Co., Ltd., against defendant, Texas & Pacific Railway, et al., through the receivers J. L. Lancaster and C. L. Wallace, in the sum of $996.19 with legal interest from September 20, 1920, and all costs.

It is further ordered, adjudged and decreed that the suit be dismissed as against the City of New Orleans.